**United States District Court**
**District of Massachusetts**

```
_____ )
                                )
NICOLE PONTE,                   )
        Plaintiff,              )
                                )
        v.                      )      Civil No.
                                )      12-10376-NMG
STEELCASE INC.,                 )
        Defendant.              )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Plaintiff alleges that defendant, her former employer, violated Massachusetts and federal law by tolerating purported sexual harassment by her supervisor and by later terminating her employment in retaliation for her complaints about the same. Defendant moves for summary judgment on all claims.

By prior order, the Court ruled that defendant's motion for summary judgment would be allowed and plaintiff's Complaint would be dismissed in accordance with a memorandum to follow. The Court now publishes that memorandum, allows defendant's motion and dismisses the case.

**I.   Factual Background**

**A.   Parties**

Defendant Steelcase Inc. ("Steelcase") is a Michigan company that manufactures furnishings and offers services for the workplace, primarily by selling them through dealers located

-1-

throughout the United States and elsewhere.  Steelcase markets and sells its healthcare products and services through a brand called Nurture.

Plaintiff was hired in June, 2010 to be the Area Healthcare Sales Manager for New England in the Nurture Division of Steelcase.  In that role, two of plaintiff's key duties were to meet sales goals and to maintain and develop relationships with defendant's clients, including its dealers who directly sold those products.  Plaintiff remained employed in that position until her termination in May, 2011.  During the 11 months of her employment Mr. Robert Lau was plaintiff's direct supervisor.

**B.   Incidents of Alleged Sexual Harassment**

As part of her training, plaintiff attended orientation along with other newly hired managers at defendant's headquarters in Grand Rapids, Michigan in July, 2010.  One evening, Lau hosted a dinner for plaintiff and three of her colleagues, Benjamin Pratt, Jared Mejeur and Robin Goldhawk.  Upon its conclusion, although he was staying elsewhere, Lau purportedly insisted on driving plaintiff back to her hotel.  During the ride, Lau rested his arm on the top of plaintiff's seat and, as he did so, Lau's hand touched plaintiff's shoulder for about one minute.

The nature and purpose of the ride is disputed.  According to plaintiff, while Lau was touching her shoulder, he told her that he "did a lot to get [her the] job" and that she "needed to

do the right thing by him."  Plaintiff felt uncomfortable and later testified that she believed Lau wanted to make sure she knew that she "owed him."  Defendant claims, meanwhile, that Lau offered to drive plaintiff home merely because he wanted to check in with his new hire, whom he would see infrequently because the two worked in different cities.  Defendant further notes that Lau removed his hand after a minute of his own accord and without plaintiff asking him to do so.

Although defendant disputes her claim, plaintiff recalls the scenario repeating itself a second time during her orientation, following another dinner with Lau and three colleagues.  On that second occasion, Lau rested his arm on plaintiff's seat for the duration of the car ride, approximately 15 to 25 minutes, while his hand again touched her shoulder.

Plaintiff discussed her discomfort regarding her car rides with Lau with two of her peer trainees, Mejeur and Goldhawk, and told them, in so many words, that Lau had "tried to hit on her" and that she was "taken aback" by his actions.  She did not report any concerns about Lau to any other personnel at defendant at that time.

### C.   Lau's Concerns about Plaintiff's Performance

Lau began documenting concerns about plaintiff's performance from approximately the beginning of her tenure with defendant. Some of those concerns came from defendant's own staff. In

approximately July, 2010, plaintiff's human resources contact, Mary Chestnut, reported to Lau that plaintiff was having difficulty completing the "on-boarding process" which consisted of administrative tasks that all new employees had to complete. Later, in January, 2011 when plaintiff completed her required training, plaintiff's trainer provided negative feedback to Lau about plaintiff's performance, including concerns about her professionalism, and particularly her late arrival to training sessions and use of her smartphone while attending them.

Lau also documented concerns based upon complaints he received from two dealers located within plaintiff's sales territory. Plaintiff's contact at one such dealer, Susan Hughes, complained to Lau that plaintiff was late to her first meeting with Ms. Hughes and the client's CEO, in or around late June, 2010. Ms. Hughes reported that when plaintiff did arrive, she appeared disorganized and unprepared. Plaintiff failed to appear at all for her second meeting with the same client. In March, 2011, Lau received a second complaint from plaintiff's contact at another dealer, who opined that plaintiff had difficulty communicating well with her and had "not made a positive impact" for defendant. In response to that complaint, Lau organized a meeting between Ms. Ludlow and plaintiff later that month in an attempt to foster their reconciliation, to which plaintiff arrived one hour late.

-4-

In response to these concerns, Lau arranged for plaintiff to receive additional feedback and supervision.  He communicated directly with plaintiff concerning the development of plaintiff's "soft skills."  Beginning in June, 2010, he arranged for plaintiff to meet with another sales manager at defendant to provide additional assistance.  Lau also conducted weekly phone conferences with plaintiff, beginning in August, 2010.  Both steps reflected additional measures he took to supervise plaintiff that he did not take with any other sales manager reporting to him.

### D.   Plaintiff's Complaints regarding Lau and Termination

Some time in either February or March, 2011, plaintiff spoke to Ms. Chestnut, her human resources contact, in order to complain about Lau.  Plaintiff claims that during this conversation she implied that Lau had harassed her, although she did not go into detail regarding her car rides with Lau.  Rather, she told Ms. Chestnut that she and Lau had been alone on "a couple of occasions" and that during that time she was "made to feel uncomfortable."  Plaintiff also complained that she felt unsupported in her role and faulted Lau for that.

Plaintiff complained to Chestnut again in an email sent in late April, 2011, on the evening that plaintiff was originally scheduled for her first performance review with Lau (a meeting which she postponed on account of a family emergency).  In that

email, plaintiff "reiterate[d]" her prior complaints about Lau
that she had expressed in their original conversation but did not
specifically discuss her car rides with him.  Plaintiff also
wrote that she was distressed by her "communications with [Lau]
and lack of support from him."

When plaintiff and Lau eventually met for her performance
review, Lau rated her "below expectations," explained his
concerns about her difficulty developing "soft skills" and noted
that she had failed to meet her sales goals.

Plaintiff's termination soon followed.  After visiting
plaintiff's site in Boston in early May, 2011, Lau again
documented his concern's about plaintiff's performance, including
the comments that she was disorganized during her visit and
failed to "lead" sales efforts or repair her relationship with
Ms. Hughes.  Lau, in consultation with his supervisor, Kyle
Williams, then decided to terminate plaintiff's employment and
scheduled a second visit to Boston to do so.  Having learned of
the second visit, plaintiff emailed Williams to complain about
Lau, explaining that she had "concerns" about Lau and that she
had shared "what happened" with Goldhawk and Mejeur about the
"private issues" that had taken place.  In spite of her protest,
in late May, 2011 Lau met with plaintiff in Boston, Massachusetts
and informed her that her employment was terminated.

## II.   **Procedural History**

Plaintiff filed a three-count Complaint in Massachusetts Superior Court for Suffolk County in early December, 2011, alleging that defendant had tolerated the creation of a hostile work environment based upon sexual harassment and had terminated her in retaliation for protected activity, in violation of both M.G.L.c. 151B (Counts I and II) and 42 U.S.C. § 2000 (Count III).

Defendant duly removed the case to federal court in February, 2012 and, at the close of discovery, moved for summary judgment in April, 2013.

## III. **Analysis**

Defendant moves for summary judgment pursuant to Fed. R. Civ. P. 56 on all counts of plaintiff's Complaint.

### A.   **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Johnson v. Gordon, 409 F.3d 12, 16-17 (1st Cir. 2005)(quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the

suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." <u>Id.</u>  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. <u>Johnson</u>, 409 F.3d at 17.  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. <u>Id.</u>

### B.   Sexual Harassment

Plaintiff alleges defendant created a hostile work environment by tolerating Lau's offensive conduct, namely, the two occasions in which Lau insisted on driving plaintiff to her hotel and rested his hand on her shoulder.  Defendant argues that those two episodes raise no genuine issue of material fact with respect to plaintiff's sexual harassment claim because the

allegations fail to establish the final four elements of the requisite six-part test for hostile work environment. Because the record does not provide a sufficient basis for a reasonable fact finder to conclude that the alleged harassment was sufficiently severe or pervasive to evince a hostile work environment, the Court will allow defendant's motion for summary judgment on plaintiff's sexual harassment claims.

### 1.   Law

Requiring a person to work in a discriminatorily hostile or abusive environment violates Title VII and M.G.L.c. 151B. See Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 17 (1st Cir. 2013); Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005).[1] To prevail on a hostile work environment sexual harassment claim, a plaintiff must establish in essence: (1) membership in a protected class and (2) unwelcome sexual harassment, (3) which was based on sex, (4) was sufficiently severe or pervasive, (5) was objectively and subjectively offensive, and finally (6) that some basis for employer liability has been established. Gerald, 707 F.3d at 17.

With respect to the fourth factor, there is "no mathematically precise test" capable of identifying when conduct

---

[1] Because it is the practice of the Supreme Judicial Court of Massachusetts ("the SJC") to apply federal anti-discrimination case law when construing M.G.L.c. 151B, the Court considers federal case law to assess plaintiff's claims pled under that Chapter. See Noviello, 398 F.3d at 91.

is sufficiently severe or pervasive so as to create a hostile

work environment. Id. at 18.  Rather,

> several factors, none of which are [sic] individually
> determinative, are relevant: the severity of the conduct,
> its frequency, whether it is physically threatening or
> not, and whether it interfered with the victim's work
> performance.

Id. (citation omitted).

## 2.  Application

Although the Court is mindful that the "severe and

pervasive" inquiry is fact-specific and is often reserved for a

fact-finder, summary judgment remains an "appropriate vehicle for

polic[ing] the baseline for hostile environment claims." Pomales

v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006)

(internal quotations and citations omitted).  Such "policing" is

appropriate here because the factors utilized by courts to assess

whether alleged harassment is sufficiently "severe and pervasive"

demonstrate that plaintiff's claim falls below the "baseline" of

harassment established by prior cases.

First, although it offended plaintiff, Lau's harassing

conduct was subtle rather than severe.  Even when reasonable

inferences are drawn in plaintiff's favor, Lau's conduct, i.e.

his insistence on driving plaintiff home alone and by resting his

arm around her seat and his hand upon her shoulder, is best

described as an attempt to begin a romantic relationship with

plaintiff.  Plaintiff does not claim that Lau directly

propositioned her, made lewd remarks or otherwise engaged in behavior that is "often the stuff of hostile work environment claims." See Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008) (characterizing offensive behavior).  Rather, the conduct alleged here appears similar to conduct previously found insufficient to support a sexual harassment claim. See Rivera-Martinez v. Commonwealth of Puerto Rico, 2007 WL 16069, at *1 (1st Cir. Jan. 4, 2007) (affirming summary judgment against employee where supervisor allegedly "gently caressed her forearm" and "touched her hip and buttocks" while using his hips to push her out of a room).  Moreover, plaintiff did not report the conduct to individuals capable of investigating her claim until at least six or seven months after it occurred, and the two co-workers who she did tell contemporaneously recalled only that she said Lau acted "inappropriately" and "hit on her."  In the spectrum of harassing acts, Lau's conduct was not severe.

Second, Lau's conduct was not frequent.  It occurred only two times over a short period during training sessions in July, 2010.  Ordinarily, hostile work environment claims "are bred from an ongoing series of harassing incidents." Noviello, 398 F.3d at 84.  Plaintiff identifies no other offensive conduct following that initial time period despite working directly for Lau until she was terminated in May, 2011.  Although a single incident of harassment, "if egregious enough," can support a hostile work

environment claim, see id., the two incidents described by
plaintiff fall outside that category. See id. at 97 (expressing
doubt that single sexual assault, where coworker removed
plaintiff's brassiere, hung it from side mirror of their van and
bellowed a crude sexual remark, "was sufficient, in and of
itself, to create a hostile work environment"); see also Pomales
v. Celulares Telefonica, Inc., 447 F.3d 79, 83-84 (1st Cir. 2006)
(single incident insufficient to be severe and pervasive); Morgan
v. Massachusetts Gen. Hosp., 901 F.2d 186, 192-93 (1st Cir. 1990)
(same).

Third, although the offensive conduct involved unwanted
physical contact when Lau's hand touched plaintiff's shoulder,
there is no evidence to suggest that that contact was "physically
threatening."  Plaintiff testified only that she felt
uncomfortable and does not claim that Lau ever used threatening
language or forceful touching.  Lau's conduct was materially
different from incidents where courts have found conduct to be
physically threatening. Cf. Gerald, 707 F.3d at 18 (incident
where employee grabbed plaintiff's breasts was physically
threatening).

Fourth, and finally, there is insufficient evidence in the
record demonstrating that Lau's conduct interfered with
plaintiff's performance.  The only evidence of such claim is
circumstantial, namely, that Lau's conduct occurred at the

beginning of plaintiff's tenure, which is also when plaintiff's performance issues began. It is unreasonable to infer from that evidence any causal relationship, however, because no further offensive conduct is alleged, Lau saw plaintiff infrequently and plaintiff's purported failings occurred outside of Lau's presence and were observed by individuals with no knowledge of the alleged harassing incidents.

In sum, none of the traditional factors used by courts to assess the severity and pervasiveness of offensive conduct could permit a reasonable jury to find in plaintiff's favor and, further, the two offensive incidents alleged by plaintiff appear less severe than other cases in which courts have found that summary judgment is merited. See Rivera-Martinez, 2007 WL 16069, at *3 (collecting cases involving limited incidents of harassing conduct and affirming summary judgment). Accordingly, defendant's motion for summary judgment on plaintiff's sexual harassment claims will be allowed.

### C.    Retaliatory Termination

Plaintiff argues that her termination, rather than being based upon her performance issues, was motivated by a desire to retaliate against her on the basis of her complaints about Lau. Because the Court concludes that plaintiff has failed to introduce sufficient evidence to permit a reasonable jury to find that defendant's decision to terminate her was a pretext for

unlawful retaliation, the Court will grant summary judgment on her retaliation claim.

### 1. Law

Retaliatory discrimination claims based upon circumstantial evidence under both Title VII and Chapter 151B apply the familiar, burden-shifting framework requiring a prima facie showing, articulation of a non-discriminatory justification and ultimately proof by the plaintiff that that reason was pretextual. See, e.g. Espinal v. Nat' Grid NE Holdings 2, LLC, 693 F.3d 31, 35 (1st Cir. 2012).  In the context of a claim for retaliatory termination, the prima facie burden requires a plaintiff to produce evidence that (1) she engaged in protected conduct; (2) she was discharged; and (3) a causal connection exists between the discharge and the protected conduct. Gerald, 707 F.3d at 24.

Once a prima facie case is established, the burden shifts to the employer who must adduce a legitimate, non-discriminatory reason for plaintiff's termination. Id.  Plaintiff must then carry the ultimate burden and show that the employer's adduced reason is a pretext and that retaliatory animus was the true motivating factor in the decision. Id.

Relevant here, a court assessing pretext must focus on the perception of decision-maker, i.e. whether the employer believed its stated reason for termination was credible. Mesnick v. Gen.

Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991).  It is not enough for the aggrieved employee to "impugn the veracity" of decision-maker; rather, the employee must elucidate specific facts enabling jury to conclude that the reason was not only a "sham" but one "intended to cover up the employer's real [discriminatory] motive." Id.

### 2.  Application

It is doubtful whether, on the evidence currently in the record, plaintiff has established a prima facie claim of retaliation because her complaints about Lau's conduct are, at best, vague and never specifically accuse him of sexual harassment. See Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (explaining that "protected activity" element refers to action taken to protest or oppose "statutorily prohibited discrimination").  Plaintiff's April, 2011 email does not mention sexual harassment specifically but simply reiterates the concerns she conveyed to Chestnut in February or March, 2011. Plaintiff did not describe the details of her car rides with Lau, however, in her conversation with Chestnut.  Rather, she told Chestnut only that she was "made to feel uncomfortable" when she was alone with Lau on a few occasions but that she "didn't want to pursue it."  Plaintiff's complaints about Lau's management style, of course, do not constitute opposition to "statutorily prohibited discrimination."

Even assuming that plaintiff has met the relatively low threshold of satisfying a prima facie case for retaliation, her retaliation claim must still be dismissed.  Defendant has adduced sufficient evidence supporting a legitimate, non-discriminatory reason for terminating plaintiff and no reasonable jury could find that the adduced reasons were merely a "sham" meant to cover up defendant's desire to terminate plaintiff because she complained of sexual harassment.

Defendant claims to have terminated plaintiff on account of her poor job performance.  There is ample, undisputed evidence that defendant believed plaintiff was under performing.  Defendant received at least two unsolicited complaints from plaintiff's dealers, first in July, 2010 when plaintiff appeared late and unprepared for her first meeting with a client and again in March, 2011 from the representative of another client.  Lau began documenting his concerns in July, 2010 and attempted to address the problem by communicating directly with plaintiff about improving her "soft skills" through weekly phone conferences and arranging additional supervision for plaintiff from other salespersons.  Finally, Lau explained his concerns about plaintiff's "soft skills" in the April, 2011 performance review.  All of the steps taken by Lau provide evidence that he was concerned about plaintiff's performance essentially from the beginning of her employment with defendant.  Such evidence easily

satisfies defendant's burden of adducing a legitimate, non-discriminatory reason for plaintiff's termination.

The robust record of plaintiff's inadequate performance, when compared to plaintiff's weak evidence supporting a prima facie claim of retaliation, render summary judgment appropriate for two principal reasons.  First, there is little evidence that Lau knew of plaintiff's claimed, protected activity, namely, her complaints about him to Ms. Chestnut.  See Medina-Rivera, 713 F.3d at 139 (employer cannot be motivated to retaliate on the basis of complaints of which he was unaware).  Plaintiff never informed Lau of her accusations and asked Ms. Chestnut not to share her April, 2011 email with Lau.  Ms. Chestnut denies ever telling Lau about plaintiff's April, 2011 email or about the content of their earlier conversations.  The only evidence plaintiff submits in support of her claim is that Lau emailed Chestnut regarding plaintiff's poor performance within a few hours of plaintiff's email, which, in her view, means that Chestnut must have informed Lau of her complaints and Lau must have responded to defend his own conduct.  The basis upon which a jury could attribute retaliatory motive to Lau is, therefore, tenuous.

Second, nearly all of the evidence of plaintiff's poor performance, upon which defendant claims it relied when terminating her, predates plaintiff's earliest possible complaints about Lau's behavior to Ms. Chestnut.  When problems

with an employee predate any knowledge that the employee engaged
in a protected activity, it is not permissible to draw the
inference that a subsequent adverse employment action, taken
after the employer acquires such knowledge, is motivated by
retaliation. Sills v. Waddel & Reed, Inc., Civ. No. 08-10314-DPW,
2009 WL 5943105, at *11 (D. Mass. Feb. 25, 2009) (citing Mole v.
Univ. of Massachusetts, 814 N.E.2d 329, 340 (Mass. 2004)); see
also Hoeppner v. Crotched Mountain Rehab. Ctr., Inc., 31 F.3d 9,
14-16 (1st Cir. 1994) (affirming summary judgment where employee
was already on probation prior to filing sexual harassment
claim).  Even if Lau learned of plaintiff's April, 2011 email
shortly after she wrote it, the customer complaints, negative
feedback from plaintiff's trainer and all of Lau's weekly phone
conferences meant to coach plaintiff on her "soft skills"
predated his knowledge of said complaint.  In the face of ample
evidence supporting defendant's conclusion that plaintiff was
performing below par before she engaged in any protected
activity, no reasonable jury could find that defendant's decision
to terminate her on that basis was merely a pretext for unlawful
retaliation.[2]

Plaintiff's principal argument to the contrary is
unavailing.  She asserts that during her performance review in

---

[2] For the same reason, plaintiff's May, 2011 complaint to
Lau's supervisor is irrelevant because Lau decided to terminate
her before she sent it.

April, 2011 in which she received a poor rating, Lau substantially under-reported the amount of sales attributed to her region and that, if the sales records were accurately reported, they would demonstrate that she reached a higher percentage of her sales goals than her peers under Lau's supervision.  That claim does not demonstrate that the reason given by defendant for her termination was a "sham" or pretext. Lau emphasized throughout her tenure that plaintiff needed to work on her "soft skills" and it was her failure to improve in those areas that formed the basis for Lau's decision to terminate her.  Moreover, although plaintiff is correct that her sales record constituted 40% of her performance review, and was therefore the most significant criterion used by defendant to evaluate her performance, the remaining 60% of her evaluation depended upon the "soft skills" identified by Lau as plaintiff's weakness.  That argument, therefore, fails even to "impugn the veracity" of Lau's reasons for her termination, much less carry the ultimate burden of persuasion to show that plaintiff was fired because of her protected conduct.

**ORDER**

In accordance with the foregoing, and as previously announced, defendant's motion for summary judgment (Docket No. 21) is **ALLOWED** and the case is **DISMISSED**.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated July 25, 2013